Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| KATHERINE M. MAHER, Individually and as Personal Representative of THE ESTATE of DANIEL L. MAHER, DANIEL R. MAHER and JOSEPH F. MAHER,<br><br>*Plaintiffs*,<br><br>v.<br><br>BAUMEISTER & SAMUELS, P.C., MICHEL F. BAUMEISTER, ESQ., DOROTHEA M. CAPONE, ESQ. and JOHN DOES # 1 through 10, inclusive,<br><br>*Defendants*. | Civil Action No. 22-cv-02054<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This case arises out of an attorney-client relationship, which was formed to pursue compensation for Plaintiffs due to the death of Daniel L. Maher in the September 11, 2001 terrorist attacks.  Plaintiffs now sue Baumeister & Samuels, P.C. and two individual attorneys, Michel Baumeister and Dorothea Capone (collectively "Defendants"), for allegedly deficient representation of Plaintiffs.  Currently pending before the Court is Defendants' motion to dismiss Plaintiffs' Complaint.  D.E. 12.  The Court reviewed the parties' submissions[1] and decided the

---

[1] The submissions consist of Defendants' motion to dismiss, D.E. 12 ("Br."); Plaintiffs' opposition, D.E. 15 ("Opp."); and Defendants' reply in further support of their motion to dismiss, D.E. 16 ("Reply").

motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b).  For the following reasons, Defendants' motion is **GRANTED in part** and **DENIED in part**.

## I.    BACKGROUND[2]

Daniel L. Maher was killed in the September 11, 2001 terrorist attacks.  D.E. 1-1 ("Compl.") ¶ 2.  Maher's spouse, Katherine Maher was appointed as executrix of decedent's estate ("Estate").  *Id.* ¶ 9.  The Defendant law firm, Baumeister & Samuels, P.C., ("B&S") was retained to represent Ms. Maher; the Estate; and the couple's two sons, Daniel R. Maher and Joseph F. Maher (collectively, "Plaintiffs").  *Id.* ¶ 10.  Defendants Baumeister and Capone, with whom the Plaintiffs dealt, are partners/shareholders of B&S.  *Id.* ¶¶ 6-7.  The retainer agreements specified that B&S was "to prosecute or adjust claims for damages arising out of the death of Daniel L. Maher on the 11th day of September, 2001[.]"  D.E. 12-2 ("Retainer Agreements").  The Retainer Agreements further gave B&S "the exclusive right to take all legal steps to enforce said claims." *Id.*  Plaintiffs allege that they understood "[t]hrough conversations between Ms. Maher and Mr. Baumeister and Ms. Capone, and through the retainer agreement" that "B&S would advocate for Plaintiffs' rights and properly protect and advance Plaintiffs' interests, whether through litigation, political lobbying, or with respect to any funds set up to help recovering 9/11 families."  Compl. ¶ 12.

---

[2] The factual background is taken from Plaintiffs' Complaint, D.E. 1-1, Ex. A.  The Court also considers the retainer agreements attached to the Declaration of Defendant Dorothea M. Capone, D.E. 12-2, because they are integral to the pleading and directly referenced in the Complaint.  *See U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (explaining that when deciding a motion to dismiss under Rule 12(b)(6), a court may rely on "a document *integral to or explicitly relied* upon in the complaint" (emphasis in original) (citation omitted)).  The Court also takes judicial notice of a default judgment obtained by Plaintiffs in another case as a matter of public record.  *See Logan v. Bd. of Educ. of Sch. Dist. of Pittsburgh*, 742 F. App'x 628, 631-32 (3d Cir. 2018).

Plaintiffs point to three overarching errors by Defendants: (1) a failure to pursue claims against Sudan and Iran, (2) a failure to lobby for a change in the Special Master's interpretation of the United States Victims of State Sponsored Terrorism Fund ("USVSST") due to a conflict of interest, and (3) a failure to pursue a final judgment against the Taliban.

**A.  Claims Against Iran and Sudan**

Defendants filed a complaint on behalf of Plaintiffs in the United States District Court for the Southern District of New York ("SDNY") entitled *Bauer v. al Qaeda Islamic Army, et al.*, 02-cv-7236.  *Id.* ¶ 14.  The *Bauer* case was consolidated with others in the *Ashton* case, in which a Consolidated Master Complaint was filed, bringing Foreign Sovereign Immunities Act ("FSIA") claims against the Islamic Republic of Iran and multiple related Iranian parties, the Republic of Sudan and multiple related Sudanese parties, and the Taliban.  *Id.* ¶ 16.  Ultimately, the Judicial Panel for Multi-District Litigation consolidated the *Ashton* case with others in the SDNY under the caption *In re Terrorist Attacks on September 11, 2001*, 03-MDL-1570.  *Id.* ¶ 17.  Plaintiffs allege that "B&S, however, made very little effort, if any, to advance and protect the Plaintiffs' claims against Iran, Sudan and the Taliban."  *Id.* ¶ 20.

Plaintiffs claim that parties who had "timely obtained judgments against Iran and Sudan have received substantial compensation."  *Id.* ¶ 25.  As to Sudan, Plaintiffs point to final default judgments obtained against Sudan by victims of other terrorist attacks, the 1998 Embassy bombings and the 2000 USS Cole bombing.  *Id.*  Plaintiffs allege that, in early 2020, "Sudan was attempting to normalize relations with the U.S. and, as part of that effort, intended to pay the Embassy Victims and the Cole Victims large settlements ($10 million per victim's family . . .)."  *Id.*  In the agreement between Sudan and the United States, the U.S. government categorically excluded 9/11 claimants from compensation because "the 9/11 victims had not obtained judgments

3

or a finding of liability against Sudan, whereas the Embassy Victims and Cole Victims had." *Id.*

Plaintiffs continue that "the 9/11 families, including Plaintiffs, were not included in any

compensation package with Sudan because the 9/11 attorneys, including Defendants, had

'abandoned' the Sudan claims, never finalized the defaults, and had no findings of liability against

Sudan that would enable the U.S. government to quantify damages for payment." *Id.* Plaintiffs

contend that had Defendants properly pursued and obtained final judgments against Sudan,

Plaintiffs would have received "substantial recoveries." *Id.* ¶ 26.

As to Iran, Plaintiffs similarly allege that while "other plaintiffs were actively engaging in

efforts to secure default judgments for their claims against Iran," Defendants were not. *Id.* ¶ 22.

Plaintiffs explain that parties who did obtain final default judgments against Iran "have received

substantial compensation," which Plaintiffs allege they have not received. *Id.* ¶ 25. It appears,

however, that Defendants did in fact obtain default judgments against Iran on behalf of Plaintiffs.

*See Federal Insurance, et al. v. Al Qaida, et al.*, 1:03-cv-06978, ECF No. 951 (S.D.N.Y. Mar. 9,

2016).[3]

### B. Lobbying the Special Master

Plaintiffs next allege that in 2015, lobbying efforts resulted in the USVSST, a fund intended

to compensate victims of state-sponsored terrorism. Compl. ¶¶ 27-30. The USVSST Special

Master determined that those who had already received payments from the Victim Compensation

Fund of 2001 ("VCF"), which included Plaintiffs, were ineligible to receive payments from the

---

[3] The Court may properly consider the existence of the default judgments at the motion to dismiss stage as a matter of public record. *Logan*, 742 F. App'x at 631-32 (noting that a court may consider "matters of public record" at the motion to dismiss stage); *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) ("To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint.").

USVSST.  *Id.* ¶ 34.  Plaintiffs contend that the Special Master's interpretation of the USVSST was "patently incorrect, . . . is not present anywhere in the USVSST language or law," and was not "a reasonable or fair interpretation of the law."  *Id.*  Plaintiffs allege that B&S did not inform them of this determination and did not participate in conference calls with the Special Master or submit written comments to advocate for Plaintiffs' interests.  *Id.* ¶ 35.  Plaintiffs add that had they "been advised of the available opportunity to voice their position, they and the other 9/11 families would have been successful in either convincing the Special Master that his exclusion of persons receiving VCF1 funds was incorrect or in obtaining a clarification of the USVSST law."  *Id.* ¶ 37.

Plaintiffs assert that Defendants' inaction was due to a conflict of interest.  Essentially, Plaintiffs allege that Defendants also represented other "non-heir"[4] clients who had not received any VCF funds and thus were eligible to recover under the USVSST.  *Id.* ¶ 30.  According to Plaintiffs, "B&S was rushing to obtain judgments for, and was submitting applications to the USVSST Fund on behalf of," these non-heir clients.  *Id.* ¶ 38.  Plaintiffs deem this an "impermissible conflict of interest" because "B&S could not have effectively represented all of its clients in connection with the USVSST Fund" since some clients were recovering from the fund while others were being excluded by the Special Master's "incorrect and unfair interpretation of the law."  *Id.* ¶¶ 38-39.  Plaintiffs claim that, in the face of this conflict, B&S had three options: (1) "advocate for a change in the law" that would allow Plaintiffs to obtain funds through USVSST, (2) not advocate for a change in the law and allow only the non-heir clients to recover, to the exclusion of Plaintiffs, which would still permit Defendants to collect fees from the non-heir clients, or (3) "not represent any clients with respect to the USVSST Fund, which . . . would have

---

[4] The Court notes that Plaintiffs have not sufficiently alleged that a person's status as an "heir" or "non-heir" has any bearing on whether a person is entitled to compensation from either VCF or USVSST.  However, the Court uses Plaintiffs' terms for consistency.

resulted in B&S missing out on many millions of dollars in fees." *Id.* ¶ 39.  Plaintiffs allege that B&S took the second path, and, "[h]ad Defendants not been conflicted among classes of clients, they could have properly advocated for Plaintiffs and similarly-situated clients." *Id.* ¶¶ 40, 45.

Plaintiffs further allege that on March 20, 2019, after they questioned B&S about the USVSST, Mr. Baumeister terminated B&S's representation of Plaintiffs. *Id.* ¶ 48.  After the termination, "[i]n a matter of months after vigorously advocating for themselves, Plaintiffs and others convinced Congress to clarify the USVSST." *Id.* ¶ 51.  On November 21, 2019, Congress passed the United States Victims of State Sponsored Terrorism Fund Clarification Act (the "Clarification Act") which expressly permitted parties who received VCF funds to qualify for USVSST funds. *Id.* ¶ 51.  Plaintiffs contend that Defendants' failure to advocate for their interests resulted in over $2 million in damages.  *Id.* ¶ 52.  This figure comes from the Government Accountability Office's audit, which, on June 11, 2021, determined that VCF recipients who were previously excluded from the USVSST would need to receive $2,020,055 to "catch-up" with those who had received compensation in the fund's first two distributions.  *Id.*

### C.  Claims Against the Taliban

Plaintiffs also allege that Defendants failed to adequately pursue a final judgment against the Taliban. *Id.* ¶ 55.  "In 2021, the United States withdrew from Afghanistan" and "the Taliban took control and ownership of Afghanistan's government and assets." *Id.* ¶¶ 56-57.  "As of August 2021, the Federal Reserve Bank of New York [("FRBNY")] held approximately $7 billion of Afghanistan's central bank reserves, to which the Taliban claim ownership." *Id.* ¶ 58.  Such funds have been frozen, and Plaintiffs allege on information and belief that "parties holding final judgments against the Taliban will receive substantial recoveries" from these funds. *Id.* ¶¶ 59-60.  Plaintiffs assert that "[h]ad Defendants diligently pursued judgments against the Taliban, then

Plaintiffs would have had such judgments as well and would have joined in the execution on Taliban assets, entitling Plaintiffs to receive payment from the Taliban assets as well." *Id.* ¶ 61.

Plaintiffs filed their Complaint in the Superior Court of New Jersey on March 17, 2022. The Complaint alleges that the acts and omissions described above constitute a breach of fiduciary duty, unjust enrichment, breach of contract, breach of the implied covenant of good faith and fair dealing, attorney malpractice, and negligent misrepresentation.  Defendants removed the case to this Court on April 8, 2022.  D.E. 1.  The current motion followed.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint that fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  For a complaint to survive dismissal under Rule 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Further, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims."  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016).  In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  Restatements of the elements of a claim are legal conclusions and are not entitled to a presumption of truth.  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011).  The Court, however, "must accept all of the complaint's well-pleaded facts as true[,]" and grant a plaintiff the benefit of all reasonable inferences arising therefrom.  *Fowler*, 578 F.3d at

210.  The factual allegations "must be enough to raise a right to relief above the speculative level."

*Twombly*, 550 U.S. at 545.

## III.   ANALYSIS

### A.  Choice of Law

Defendants claim that New York law should apply to certain portions of this motion because all of the underlying litigation took place in New York.  Plaintiffs respond that New Jersey law should apply because New Jersey has a more substantial interest in this litigation or because there is no difference in the law on certain questions.

"A federal court sitting in diversity jurisdiction must apply the forum state's choice of law rules" to determine what law governs the substantive issues of a case.  *Maniscalco v. Brother Int'l Corp.*, 793 F. Supp. 2d 696, 704 (D.N.J. 2011).  New Jersey, the forum state here, utilizes the "most significant relationship" test to determine the applicable substantive law.  *Id.*; *Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 373 (D.N.J. 2019).  The test consists of two prongs.  The first requires that a court assess the potentially applicable laws to determine if there is an actual conflict between the laws at issue.  *Maniscalco*, 793 F. Supp. 2d at 704.  An actual conflict exists "if there is a distinction between" the relevant laws.  *Buccilli v. Nat'l R.R. Passenger Corp.*, No. 08-4214, 2010 WL 624113, at *2 (D.N.J. Feb. 17, 2010) (internal quotation omitted).  Where no conflict exists, the court applies the forum state's law.  *Maniscalco*, 793 F. Supp. 2d at 704.  If there is a conflict, the second prong requires the court to "determine which state has the 'most significant relationship' to the claim at issue by weighing the factors set forth in the Restatement section that corresponds to Plaintiffs' cause of action."  *Id.* at 705.

Sections 145 and 6 of the Restatement (Second) of Conflict of Laws contain the factors used to determine which state has the most significant relationship to the allegations and the

parties.  Pursuant to Section 145, a court must consider the following contacts: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Mills*, 406 F. Supp. 3d at 375-76 (citing Restatement (Second) of Conflict of Laws § 145 (Am. L. Inst. 1988)).  Courts must then weigh the significance of each contact based on the Section 6 principles, which are "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Yocham v. Novartis Pharms. Corp.*, 736 F. Supp. 2d 875, 881 (D.N.J. 2010) (citing *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 147 (2008)).  The Court's assessment is qualitative, not quantitative.  *Ginsberg ex rel. Ginsberg v. Quest Diagnostics, Inc.*, 441 N.J. Super. 198, 218 (App. Div. 2015), *aff'd* 227 N.J. 7 (2016).

Because choice of law questions must be addressed on a claim-by-claim basis, the Court will assess the applicable law in each section below.

### B.  Duplicative Counts

The Federal Rules of Civil Procedure permit parties to plead in the alternative.  Fed. R. Civ. P. 8(d).  As a result, the Court would usually permit alternative claims to survive the motion to dismiss stage.  However, because legal malpractice is alleged, the Court undertakes the appropriate analysis at this stage.  The Court is concerned that due to the nature of a legal malpractice action, related claims aimed at circumventing the requirements of a malpractice claim may be impermissible.

As to the applicable law, Defendants believe that no conflict of law exists on the question of whether the claims here should be dismissed as duplicative.  Plaintiffs disagree, arguing that

New York and New Jersey law differ in that New Jersey considers claims duplicative and subject to dismissal where the alleged duty breached is the same, whereas New York considers claims duplicative where the facts and damages alleged are the same.  Opp. at 6.  The Court agrees with Plaintiffs.  *Compare Amboy Bancorporation v. Jenkens & Gilchrist*, No. 02-cv-5410, 2008 WL 3833582, at *5 (D.N.J. Aug. 13, 2008) (applying New Jersey law and dismissing claims as duplicative because the "breach of contract and breach of fiduciary claims do not allege that [defendant] breached a specific contractual or fiduciary duty separate and distinct from the duty of care owed by an attorney to a client under the negligence standard"), *with WGH Commnc'ns, Inc. v. Penachio Malara LLP*, No. 21-570-cv, 2022 WL 569665, at *2 (2d Cir. Feb. 25, 2022) (applying New York law and finding that breach of fiduciary duty and breach of contract claims were properly denied because they were "premised on the same facts as the legal malpractice claim and seek the same relief").

Because of this conflict, the Court must assess whether New York or New Jersey has the "most significant relationship" to the claims by using the factors set forth in Restatement Section 145 and Section 6.

The first factor is the place where the injury occurred.  *Mills*, 406 F. Supp. 3d at 375-76. In a legal malpractice action, the location of the injury is typically the jurisdiction where the underlying litigation took place.  *See O'Boyle v. Braverman*, 337 F. App'x 162, 167 (3d Cir. 2009) (applying New Jersey choice of law rules to a legal malpractice action and holding that the location of the injury was Tennessee, where the underlying litigation occurred).  While Plaintiffs may have felt the effects of the injury in their home states, the location of the alleged injury here is New York, where the representation took place and where Plaintiffs allege judgments should have been obtained.  Indeed, if the "location of the injury" was simply the place where Plaintiffs are

domiciled, it would be superfluous to analyze the parties' domiciles as an independent factor.  *See Jankowski v. Sandor*, No. L-1703-10, 2011 WL 3107763, at *4 (App. Div. July 27, 2011) ("Plaintiff's argument identifying the place where the injury occurred as New Jersey because that is where she suffered the economic impact of the injury is unavailing.").  Thus, this factor weighs in favor of applying New York law.

As to the second factor, the place where the conduct causing the injury occurred, the Declaration of Defendant Capone[5] states that substantially all activities performed by Defendants in relation to Plaintiffs' matter took place in New York.  D.E. 16-1 ("Capone Decl.") ¶¶ 3-15. Thus, this factor weighs in favor of applying New York law.

Turning to the third factor, Plaintiffs, with the exception of Joseph F. Maher, have at all relevant times been domiciled in New Jersey.  Compl. ¶¶ 1-4.  Plaintiff Joseph F. Maher currently resides in Michigan.  *Id.* ¶ 4.  B&S is incorporated under the laws of New York with a principal place of business in New York.  D.E. 1 ¶ 6.[6]  Mr. Baumeister and Ms. Capone are residents of Florida and North Carolina, respectively.  *Id.* ¶¶ 7-8.  Both Mr. Baumeister and Ms. Capone are admitted to practice law in both New York and New Jersey.  *Id.*  With various connections to both states under this factor, the Court finds that these facts are neutral as between New York and New Jersey.  *See O'Boyle*, 337 F. App'x at 167 (holding that Tennessee law applied after finding it

---

[5] The Court may consider this declaration for purposes of determining the conflict-of-law issue. *See Kim v. Baik*, No. 06-3604, 2007 WL 674715, at *4 (N.J.D. Feb 27, 2007) (considering an attorney affidavit to resolve a conflict-of-law issue on a motion to dismiss).

[6] The Court considers Defendants' Notice of Removal, D.E. 1, as a matter of public record solely for purposes of determining residence, place of incorporation and place of business as it applies to the choice of law issue, and not in determining the sufficiency of the Complaint.  *Logan*, 742 F. App'x at 631-32 (noting that a court may consider "matters of public record" at the motion to dismiss stage).  The Court also previously found that these states of citizenship were adequately shown to establish subject matter jurisdiction.  D.E. 23.

insufficient that "[t]he only factors weighing in favor of the application of New Jersey law are [Plaintiff's] New Jersey citizenship and the fact that [the attorney] is a member of the New Jersey bar").

As to the fourth factor, the relationship between the parties appears, to some extent, to have straddled state lines as communications took place between New York and New Jersey.  However, Plaintiffs hired Defendants for representation that would take place in New York regarding events that took place in New York.  *See id.* ("As the Appellants hired [the attorney] 'for the purpose of filing a lawsuit in Tennessee,' the parties' relationship is centered in Tennessee.").  Thus, this factor likewise weighs, at least slightly, in favor of applying New York law.

In sum, three of the four factors—the location of the injury, the place where the conduct causing injury occurred, and the place where the relationship between the parties is centered— weigh in favor of applying New York law.  The remaining factor, the domicile and place of business of the parties, is neutral.  Qualitatively, New York has a more substantial connection to the allegations and parties because the attorney-client relationship which allegedly gives rise to liability was initiated to pursue claims in New York resulting from events that took place in New York, and substantially all actions by the Defendant attorneys took place in New York.  New York's connections to this matter are not outweighed by the fact that Plaintiffs are citizens of New Jersey and that Defendants are members of the New Jersey Bar and may conduct some business in New Jersey.  Thus, the Section 145 analysis calls for the application of New York law.  The Section 6 principles—the interests of interstate comity, the parties, the underlying field of tort law, judicial administration, and the competing interests of New York and New Jersey—are largely neutral and do not call for an alternative result.  Thus, as to the argument that the counts in the Complaint are duplicative, the Court will apply New York law.

12

Turning to Defendants' substantive arguments, Defendants assert that five counts of the Complaint must be dismissed as duplicative of the attorney malpractice claim. Br. at 12. Specifically, Defendants contend that Plaintiffs' attorney malpractice claim (Count Five) encompasses the claims for breach of fiduciary duty (Count One), unjust enrichment (Count Two), breach of contract (Count Three), breach of implied covenant of good faith and fair dealing (Count Four), and negligent misrepresentation (Count Six).

Because New York law applies, the Court must assess whether these counts are "premised on the same facts as the legal malpractice claim and seek the same relief." *WGH Commnc'ns, Inc.*, 2022 WL 569665, at *2. "Claims that attorneys breached their fiduciary duty and breached a retainer contract are regularly dismissed as duplicative of legal malpractice claims if they arise from the same facts and circumstances and do not allege distinct damages." *Id.*; *Decker v. Nagel Rice LLC*, No. 09 Civ. 9878, 2010 WL 2346608, at *4 (S.D.N.Y. May 28, 2010) ("Under New York law, where a claim for negligence, breach of fiduciary duty, breach of contract, or failure to disclose a conflict of interest are premised on the same facts and seek the identical relief as a claim for legal malpractice, these claims are considered 'redundant and should be dismissed.'"); *Amadasu v. Ngati*, No. 05CV2585, 2006 WL 842456, at *9 (E.D.N.Y. Mar. 27, 2006) ("[P]laintiff's claims for breach of contract, breach of fiduciary duty, negligent misrepresentation, negligent performance, and gross negligence merge into plaintiff's legal malpractice claim."); *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 376-77 (S.D.N.Y. 2004) (applying New York law and dismissing claims for breach of fiduciary duty, negligent misrepresentation, and breach of contract as duplicative of a claim for attorney legal malpractice).

Here, Counts One through Four are duplicative of Count Five, the attorney malpractice claim, because each claim is based upon the same facts and seeks the same relief. Counts One

through Five allege that Defendants failed to take certain actions, and each of these counts seek compensation that Plaintiffs allegedly would have incurred had the appropriate actions been taken.[7]   Plaintiffs claim for attorney malpractice alleges that Defendants failed to obtain judgments against Iran, Sudan and the Taliban, and did not properly advocate for Plaintiffs in connection with the USVSST due to a conflict of interest.   Compl. ¶ 101.   The same is true of Plaintiffs' breach of fiduciary duty claim (*Id.* ¶ 74), unjust enrichment claim (*Id.* ¶ 80), breach of contract claim (*Id.* ¶ 89), and breach of the implied covenant of good faith and fair dealing claim (*Id.* ¶ 95).   While Plaintiffs may generally plead in the alternative, Fed. R. Civ. P. 8(d), New York law is clear that claims that allege the same facts and damages as an attorney malpractice claim are redundant and should be dismissed.   *Decker*, 2010 WL 2346608, at *4.   Because Counts One through Four are based on the same facts as Count Five and seek identical compensation, they are dismissed as duplicative.

By comparison, Count Six alleges negligent misrepresentation, Compl. ¶¶ 107-16, based on different factual allegations than those as to malpractice.   The negligent misrepresentation count is premised on untrue statements allegedly made by Defendants to Plaintiffs.   For instance, Plaintiffs allege that Defendants negligently misrepresented that "they were diligently pursuing

---

[7] Plaintiffs' unjust enrichment claims also seeks disgorgement of the fees that Defendants collected in representing non-heir clients. Compl. ¶85, Wherefore Clause.  Plaintiffs have failed to plausibly plead that fees obtained on behalf of the non-heir clients were "unjustly obtained," as required by both New York and New Jersey law.  Moreover, the Court is unaware of any authority that would permit Plaintiffs to benefit from the disgorgement.   Thus, the Court does not consider disgorgement as a distinct type of damages for purposes of determining whether the unjust enrichment claim is duplicative.

Additionally, Plaintiffs seek punitive damages in connection with the claim for breach of fiduciary duty.  The parties agree that both New York and New Jersey law require "egregious conduct" before a party is entitled to punitive damages.  Plaintiffs have failed to plausibly allege an entitlement to punitive damages and the Court declines to consider them as a distinct type of damages for purposes of determining whether the breach of fiduciary duty claim is duplicative.

the terrorist co-conspirators," that "the USVSST Fund would not pay claimants significant amounts," and that "Defendants obtained a default judgment against Sudan whereas there is no evidence that they did." *Id.* ¶ 111. Plaintiffs allege that these negligent misrepresentations, *i.e.* the statements themselves, caused them to incur damages. Because the negligent misrepresentation cause of action rests on different facts, it is not duplicative of the attorney malpractice claim as pled. The Court can envision circumstances under which the alleged negligent misrepresentations are part and parcel of the malpractice claim. But Defendants, as the moving party, do not sufficiently address this issue. As a result, the motion to dismiss is denied as to Count Six.

### C. Attorney's Fees and Punitive Damages

Defendants next argue that Plaintiffs' requests for punitive damages and attorney's fees should be dismissed and/or stricken. Plaintiffs only allege an entitlement to punitive damages with respect to the breach of fiduciary duty claim and, as noted above, Plaintiffs have not plausibly pled such entitlement. The issue of attorney's fees requires a choice of law analysis. The Court finds, however, that the analysis would be substantially the same as that outlined above and would again result in the application of New York law. The parties agree that New York law adheres to the "American Rule," for legal malpractice claims, which requires the parties to pay their own attorney's fees. *See In re Hyde*, 933 N.E.2d 194, 198 (Ct. App. N.Y. 2010). This rule requires striking from the Complaint the request for attorney's fees.

### D.  Plausibility of the Attorney Malpractice Claim

Defendants also argue that Plaintiffs' attorney malpractice claim is not sufficiently plausible as the allegations are "speculative and lack specificity."  Br. at 19.  The parties agree that New Jersey and New York law are substantially the same on the requirements for an attorney malpractice claim, so the Court will apply New Jersey law.  To establish a claim for attorney malpractice, a plaintiff must prove "(1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff."  *Granata v. Broderick*, 446 N.J. Super. 449, 469 (App. Div. 2016) (citing *McGrogan v. Till*, 167 N.J. 414, 425 (2001)).  To properly plead proximate cause, "a plaintiff must allege that the negligent conduct by an attorney was a substantial factor in contributing to his harm," meaning that "the consequences would have been materially different" had the representation been proper.  *CCC Atl., LLC v. Silverang, Donohoe, Rosenzweig & Haltzman, LLC*, No. 18-17433, 2019 WL 3334797, at *4 (D.N.J. July 25, 2019).

The parties agree that an attorney-client relationship existed which created a duty of care owed by Defendants to Plaintiffs.  Defendants argue, however, that the allegations are too speculative and vague as to proximate cause.  While a complaint may proceed even if it appears "that recovery is very remote and unlikely," it must "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 545, 556.  The Complaint alleges that Defendants breached their duties to Plaintiffs by failing to pursue and obtain certain judgments and failing to advocate for them with respect to the USVSST due to a conflict of interest.  Compl. ¶ 101.  Plaintiffs further allege that but for these failures, Defendants would have obtained default judgments, USVSST funds, and been able to execute on frozen Taliban assets.  *Id.* ¶¶ 103-05.  But the Court is not

obligated to accept legal conclusions or unwarranted inferences. *Iqbal*, 556 U.S. at 678-79. Plaintiffs' allegations are not plausibly stated.

The Complaint alleges that had Defendants pursued and obtained a final judgment against Sudan, the United States government would have made a different foreign policy decision in its negotiations with Sudan, which would have allowed Plaintiffs to recover. Plaintiffs have not adequately alleged that Sudan was responsible for the September 11, 2001 terrorist attacks, a necessary prerequisite for recovering against Sudan. Further, Plaintiffs have not sufficiently pled that if they had a judgment in hand, the U.S. government would have been swayed to change course in its diplomatic negotiations with Sudan. The Court is unable to draw a reasonable inference that, had Defendants acted "properly," the result would have been "materially different."

Plaintiffs' claims regarding Iran are similarly deficient. Plaintiffs insist that while other parties were pursuing and obtaining final judgments against Iran, Defendants failed to do so. Compl. ¶¶ 24-25. Plaintiffs further allege that parties who did obtain judgments against Iran have "received substantial compensation." *Id.* ¶ 25. Plaintiffs, however, make ambiguous allegations that B&S "obtain[ed] default judgments against Iran for their new and existing clients," and it is unclear whether this includes Plaintiffs. *Id.* ¶ 42. And it appears that Defendants in fact did obtain default judgments against Iran on Plaintiffs' behalf. *See Federal Insurance, et al. v. Al Qaida, et al.*, 1:03-cv-06978, ECF No. 951 (S.D.N.Y. Mar. 9, 2016).[8] Thus, it is not clear what further actions Defendants allegedly should have taken in pursuing claims against Iran and how the failure to take those actions caused Plaintiffs to incur damages. These allegations are insufficient.[9]

---

[8] The Court may take judicial notice of matters of public record at the motion to dismiss stage, including judicial proceedings, opinions, and orders. *S. Cross Overseas Agencies*, 181 F.3d at 426.

[9] While Plaintiffs are given then opportunity to amend their allegations, the allegations regarding Iran will be deemed insufficient unless Plaintiffs plausibly plead that the default judgments

Plaintiffs also allege that Defendants should have lobbied for a change in the Special Master's interpretation of the law, which would have allowed VCF recipients to recover from the USVSST earlier. While Plaintiffs allege that they had quick success in lobbying for a change in the law themselves after Defendants terminated them as clients, it is impossible for the Court to draw a reasonable inference that Defendants alone could have adequately swayed the Special Master or Congress. First, Plaintiffs allege in conclusory fashion that the Special Master applied a "patently incorrect interpretation of the USVSST[.]" Compl. ¶ 34. Yet, Plaintiffs provide no facts in support of this allegation. Indeed, the fact that the Clarification Act was passed appears to undercut Plaintiffs' allegation (as there would be no need for clarifying legislation if the original legislation was clear). And assuming that the Special Master was incorrect, Plaintiffs fail to indicate how Defendants could have obtained relief from the erroneous interpretation. Further, Plaintiffs would need to allege sufficient facts to allow the Court to draw a reasonable inference that if Defendants had engaged in lobbying efforts within the scope of their duty, then the Clarification Act would have been passed sooner and would have entitled Plaintiffs to greater compensation. The allegations regarding lobbying the USVSST Special Master fall short, and thus fail to state a valid claim.

Defendants also contend that Plaintiffs have not alleged an actionable conflict of interest with respect to the USVSST. Both parties apply New Jersey Rule of Professional Conduct 1.7(a), which deems an attorney conflicted if "the representation of one client will be directly adverse to another client," or if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client[.]" Plaintiffs allege that

---

obtained on their behalf are invalid or otherwise plausibly allege a separate basis for malpractice even though the default judgments were obtained.

Defendants were financially motivated, to the Plaintiffs' detriment, to pursue the interests of the non-heir clients as to the USVSST funds. Compl. ¶ 39. Plaintiffs further allege that Defendants could have advocated for a change in the law to allow them to recover USVSST funds, which would have diluted funds available to their non-heir clients, and "[h]ad Defendants not been conflicted among classes of clients, they could have properly advocated for Plaintiffs." *Id.* ¶ 45.

The alleged conflict of interest hinges on Plaintiffs' allegation that the USVSST Special Master misinterpreted the law by precluding those who received compensation from VCF from recovering under USVSST. Plaintiffs characterize this interpretation as "clearly erroneous," "patently incorrect" and "unreasonable." *Id.* ¶¶ 34, 36, 51. Again, these conclusory allegations are insufficient. Moreover, given the statutory language, the Court is unable to credit these allegations. Prior to the Clarification Act, the statute stated that if a person received funds from VCF, "the amount of compensation to which such person, or the immediate family member of such person, was determined to be entitled . . . shall be considered controlling for the purposes of this section[.]" Justice for United States Victims of State Sponsored Terrorism Act, Pub. L. No. 114-113 § 404(d)(3)(A)(ii)(III), 129 Stat. 3007, 3010 (2015). This clear statutory exclusion completely undercuts Plaintiffs' allegation. As also noted, if Plaintiffs were correct, then it would seem that the Clarification Act was unnecessary. And as Plaintiffs acknowledge, the Clarification Act was necessary to overcome this exclusion. Compl. ¶ 51.

Plaintiffs have also not plausibly established that Defendants had a financial incentive that would "materially limit" their representation of Plaintiffs. In short, Plaintiffs have not sufficiently alleged why Defendants were financially motivated to have *fewer* clients. Defendants would have

apparently made *more* money,[10] not less, had Plaintiffs been able to recover from the USVSST at an earlier date.  For the foregoing reasons, an actionable conflict of interest is not plausibly pled.

Finally, Plaintiffs allege that Defendants should have pursued and obtained a final judgment against the Taliban, which would allow Plaintiffs to participate in a distribution of the Taliban's claimed funds that are currently frozen in the FRBNY. *Id.* ¶¶ 56-64.  Defendants do not dispute that pursuing an action against the Taliban was within the scope of the Retainer Agreements.  Defendants argue that it was unforeseeable that "the Taliban would take over Afghanistan and claim to become presumptive heir to the government's assets in 2021[.]"  Br. at 5.  The parties, however, do not dispute that a lawyer has a duty to keep clients informed about legal action, and to obtain client consent when deciding not to pursue a claim.  Thus, if Defendants believed that pursuing a claim against the Taliban was not worthwhile given the remote possibility of collection, they had a professional obligation to inform Plaintiffs of that view and to give Plaintiffs the opportunity to either direct that counsel continue prosecuting the claim or to obtain different counsel to pursue that claim.  Defendants, however, could not decide that they would not pursue the case without informing Plaintiffs.  The Complaint adequately alleges that Defendants breached their duties to Plaintiffs by failing to keep them informed and diligently prosecuting the action.  Compl. ¶¶ 21, 23.

At the same time, damages are speculative because there has been no legal determination that the FRBNY assets will be released to satisfy judgments against the Taliban.  As a result, the Court will dismiss the legal malpractice claim as to the Taliban without prejudice and provide

---

[10] It appears that Defendants were working on a contingency basis.  Thus, the more clients that received funds from the USVSST, the more fees Defendants could have collected.

Plaintiffs with leave to refile if and when the FRBNY (or other) assets become available to satisfy judgments against the Taliban.

## IV.     CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss the Complaint is **GRANTED in part** and **DENIED in part**.  Counts One through Four are dismissed with prejudice.  Plaintiffs may file an amended complaint that cures the identified deficiencies as to Count Five within thirty (30) days.  If Plaintiffs do not file an amended complaint within this time, Count Five will be dismissed with prejudice.  However, Plaintiffs' allegations regarding the failure to obtain a default judgment against the Taliban are dismissed without prejudice, and Plaintiff is granted leave to refile such claims if and when the FRBNY funds (or other assets) become available to satisfy such a judgment.  The motion is denied as to Count Six.  An appropriate Order accompanies this Opinion.

Dated: October 21, 2022

John Michael Vazquez, U.S.D.J.